SAMUEL COHEN ET AL. *v.* CITY OF HARTFORD
(SC 15754)

Callahan, C. J., and Borden, Norcott, Palmer and McDonald, Js.

Argued October 29, 1997—officially released March 31, 1998

*Michael A. Zizka*, for the appellants (plaintiffs).

*Delroy A. Shirley*, senior assistant corporation counsel, for the appellee (defendant).

*Opinion*

PALMER, J. In 1990, the defendant, the city of Hartford (city), adopted a regulation pursuant to which a downtown street, Pratt Street, is closed to vehicular traffic from 11:30 a.m. to 2:30 p.m., Monday through Friday, from approximately May through October, so that the street may be used as a pedestrian mall during those times. The plaintiffs, Samuel Cohen and Daniel Cohen, are the owner and manager, respectively, of two office buildings located on Pratt Street. They claim that the regulation is invalid because it is contrary to a requirement in the deed conveying Pratt Street to the

city that the land shall be used solely for purposes of a road. The plaintiffs also claim that the regulation is an unlawful exercise of the city's police power because it is not reasonably related to any legitimate government interest and, further, that even if the regulation is valid, its enforcement constitutes a taking without just compensation under the fifth amendment to the United States constitution and article first, § 11, of the Connecticut constitution.[1] We affirm the judgment of the trial court rejecting the plaintiffs' claims.

The following facts and procedural history are relevant to our resolution of this matter. In 1814, John and James Pratt conveyed the land comprising Pratt Street to the city by deed specifying that the property was to be used "for the purpose of a road and for no other purpose." At that time, the roads in Hartford were used primarily for pedestrian, horse, and horse and carriage traffic. Today, Pratt Street, which is one block long, is a one-way street in an easterly direction between Trumbull and Main Streets. It is paved, and has both curbs and sidewalks.

In 1989, the city received a grant of $2.45 million from the state of Connecticut to help defray the cost of certain improvements to Pratt Street. The purpose of these improvements was to restore Pratt Street to its nineteenth century character and, further, to revitalize the street as an important pedestrian connector between Main and Trumbull Streets. Consistent with this redevelopment plan, and for the purpose of establishing a pedestrian mall, increasing pedestrian safety

---

[1] The fifth amendment to the United States constitution provides in relevant part: "[N]or shall private property be taken for public use, without just compensation." The takings clause of the fifth amendment is made applicable to the states through the fourteenth amendment. See, e.g., *Webb's Fabulous Pharmacies, Inc.* v. *Beckwith*, 449 U.S. 155, 160, 101 S. Ct. 446, 66 L. Ed. 2d 358 (1980).

Article first, § 11, of the state constitution provides: "The property of no person shall be taken for public use, without just compensation therefor."

and maximizing Pratt Street's attractiveness to retail business, the city, on October 19, 1990, adopted a regulation[2] (regulation) pursuant to which the street is closed to vehicular traffic[3] from 11:30 a.m. to 2:30 p.m., Monday through Friday, from approximately May through October.[4]

The plaintiff Samuel Cohen is the owner of two multistory office buildings located at 57 Pratt Street and 75 Pratt Street (properties),[5] and the plaintiff Daniel Cohen manages the properties. The plaintiffs lease space in the properties for commercial, retail and office use.[6] Vehicular access to the properties is available only via Pratt Street,[7] over which the plaintiffs have a private easement of access.[8]

---

[2] The Hartford municipal code authorizes the city manager to adopt rules and regulations regarding the control of traffic and parking in the city. See Hartford Municipal Code, c. V, § 7. Pursuant to that authority, the city manager adopted the regulation regarding the closing of Pratt Street to vehicular traffic. The regulation was amended on May 1, 1992, to correct a typographical error in the regulation as originally promulgated.

[3] By agreement between Aetna Property Services, Inc. (Aetna), and the city, Aetna serves as the city's agent for the purpose of opening and closing the street to vehicular traffic in accordance with the terms of the regulation.

[4] The regulation, as amended, provides, without limitation, that Pratt Street "shall be closed daily from 11:30 a.m. to 2:30 p.m. for use as a pedestrian mall." We were apprised by the plaintiffs' counsel at oral argument, however, and it is not disputed, that the city closes Pratt Street to vehicular traffic only on weekdays. In addition, it also is undisputed that the regulation is not enforced from approximately November through April. Because the parties have treated this case as involving only these limited street closings, we do so, as well.

[5] Samuel Cohen acquired his interest in the 57 Pratt Street and 75 Pratt Street properties in 1969 and 1972, respectively.

[6] Samuel Cohen testified that 57 Pratt Street and 75 Pratt Street contain 127 and 50 offices, respectively.

[7] By contrast, the other buildings located on Pratt Street have rear or side entrances to which vehicular access may be gained from Church Street to the north, Asylum Street to the south, and Trumbull Street to the west.

[8] It is not disputed that the plaintiffs possess an access easement by reason of their ownership of the properties. Connecticut law recognizes that the existence of a public highway "creates two easements: the public easement of travel, that permits the general traveling public to pass over the highway

The plaintiffs, having unsuccessfully appealed the closing of Pratt Street to the Hartford city council pursuant to General Statutes § 14-313,[9] commenced this action seeking damages and a temporary and permanent injunction prohibiting the city from closing the street to vehicular traffic. The plaintiffs claimed that: (1) the city lacked the statutory authority to restrict the use of Pratt Street to pedestrian travel; and (2) the closing of Pratt Street violated the terms of the deed from John and James Pratt to the city specifying that the deeded property shall be used solely for purposes of a road. At the evidentiary hearing on the plaintiffs' application for a temporary injunction, the plaintiffs elicited testimony that, as a result of the street closings: (1) several of the plaintiffs' tenants had lost clients;[10] (2) at least one tenant had moved out and another was

at will, and the private easement of access, that permits the landowners who abut the highway to have access to the highway and to the connecting system of public roads." *Luf* v. *Southbury*, 188 Conn. 336, 341, 449 A.2d 1001 (1982).

[9] General Statutes § 14-313 provides: "Appeal. Any person aggrieved by any order or regulation made by any traffic authority under the provisions of this chapter, relating to the establishment of through streets, the making of safety zones, the establishment of parking restrictions or the location of loading and unloading zones, or by the performance of any act pursuant to any provision of this chapter, may take an appeal therefrom to the court of common council or to the board of aldermen of the city, to the town council or board of selectmen of the town, or to the warden and burgesses of the borough, wherein such traffic authority is located, or to the superior court for the judicial district in which it is located. Such appeal shall be to the next session of such court or board which will allow sufficient time for the service of the notice required herein. A written notice of such appeal, addressed to such traffic authority, shall be deposited with, or forwarded by registered or certified mail to, such traffic authority at least ten days before the return day thereof. Upon such hearing, such court or board shall determine whether the order or regulation appealed from is reasonable, and shall thereupon sustain or revoke such order or regulation."

[10] The testimony adduced at the hearing on the plaintiffs' application for a temporary injunction focused, to a large extent, on difficulties purportedly encountered by the plaintiffs' tenants, such as attorneys, physicians and hairdressers, whose clientele include persons who either are elderly or have disabilities and for whom, as a consequence, vehicular transportation

considering doing so; and (3) one tenant had negotiated a lower increase in his rental rate than the plaintiffs would have agreed to had the regulation not been adopted. In addition, Samuel Cohen testified that the occupancy rates at 57 Pratt Street and 75 Pratt Street had declined from 90 percent to 50 percent, and from nearly 100 percent to 75 percent, respectively, due to the street closings. The plaintiffs also indicated that they had been compelled to reduce their rental rates due to the regulation.[11] Although the trial court, *Freed, J.*, found that the plaintiffs had "suffered immeasurably from the closing of Pratt Street for the three hour periods,"[12] the court nevertheless denied the plaintiffs' application for a temporary injunction, concluding that they had failed to establish either that the city lacked the statutory authority to enforce the regulation or that the regulation violated the terms of the deed conveying Pratt Street to the city.[13]

The plaintiffs thereafter filed an amended complaint seeking a permanent injunction prohibiting the city from enforcing the regulation, as well as damages, interest, costs and attorney's fees. The amended complaint, like the original complaint, alleged that the regulation authorizing the closing of Pratt Street to vehicular traffic is contrary to the express provisions of the deed

directly to and from the properties is, at times, necessary. The plaintiffs, however, did not establish the extent to which the properties' income is derived from such tenants.

[11] The plaintiffs, however, produced no documentary or other evidence to substantiate their assertions of lost revenue.

[12] The trial court, however, made no specific finding as to any actual pecuniary loss that the plaintiffs may have suffered as a result of the street closings.

[13] Because the plaintiffs adduced uncontradicted evidence that Aetna Property Services, Inc. (Aetna), acting as the city's agent; see footnote 3; had prohibited parking on Pratt Street at times other than the three hour period from 11:30 a.m. and 2:30 p.m., the trial court entered an order "restraining [the] city from permitting Aetna . . . from prohibiting parking on Pratt [Street] except as authorized by duly adopted regulations." The court otherwise denied the plaintiffs' application for temporary injunctive relief.

conveying Pratt Street to the city. The amended complaint also alleged that: (1) the regulation is unlawful because it was not adopted by ordinance; (2) the regulation is unlawful because it promotes a private, rather than a public, purpose; (3) the impairment of the plaintiffs' private easement of access caused by the temporary closing of Pratt Street to vehicular traffic violates General Statutes § 13a-55;[14] and (4) the impairment of the plaintiffs' access easement constitutes a taking without just compensation in violation of the fifth amendment to the United States constitution and article first, § 11, of the state constitution. At trial, the plaintiffs, along with various current and former tenants, testified[15] as to the adverse impact of the regulation on the properties' occupancy rates and value. Specifically, Samuel Cohen testified that tenant turnover rates had increased as a result of the street closings, and that occupancy rates had remained the same since his testimony regarding those rates at the temporary injunction hearing. Although Samuel Cohen testified that the "vacanc[ies] started when Pratt Street was closed," he was unable to specify the extent to which the vacancies were attributable to the regulation, rather than to a general downturn in the city's economy.[16] Samuel

[14] General Statutes § 13a-55 provides: "Right-of-way of property owners bounding a discontinued or abandoned highway or a highway any portion of which is discontinued or abandoned. Property owners bounding a discontinued or abandoned highway, or a highway any portion of which has been discontinued or abandoned, shall have a right-of-way for all purposes for which a public highway may be now or hereafter used over such discontinued or abandoned highway to the nearest or most accessible highway, provided such right-of-way has not been acquired in conjunction with a limited access highway."

[15] The parties also agreed to the admissibility of the transcript of the testimony that had been adduced at the hearing on the plaintiffs' application for a temporary injunction and, in addition, entered into a stipulation of undisputed facts.

[16] Although Daniel Cohen testified that "in bad times tenants seem to look for less expensive office space and . . . our business seems to flourish," the plaintiffs produced no documentary or other evidence to substantiate this assertion.

Cohen also stated that, in his opinion, which he based on his general knowledge of the city's real estate market, the street closings had resulted in a reduction in the total value of the properties from $4.5 million to $3 million. The plaintiffs, however, adduced no other expert testimony regarding the effect of the street closings on the properties' value.

In addition, several tenants testified that, although they did not intend to relocate, they would not have leased space in the properties had they known at that time that the regulation would be adopted. Another witness testified that, when approached by Samuel Cohen with respect to renting office space in one of the properties, he had declined because of the street closings. Yet another witness, a former tenant, stated that the street closings represented one factor, although not the principal one, in his decision not to renew his lease at one of the properties. Finally, Jonathan Cohen, Samuel Cohen's son and a comanager of the properties with Daniel Cohen, testified that, as a consequence of the street closings, he had reduced the monthly rent for two new tenants from $175 to $160, in one instance, and from $175 to $150 in the other.

At the conclusion of the trial, the court, *Wagner, J.*, rejected the plaintiffs' claims and rendered judgment for the city, concluding that the "[p]laintiffs have not sustained their burden of proving that they have suffered damages as a result of the regulation restricting vehicular traffic [for] three hours daily. The estimate of reduced property value and the loss of tenants claimed by the plaintiffs was not proven to be caused by the three hour closing rather than the general decline [in the value] . . . of downtown properties in [the city] because of prevailing economic conditions and the particular needs of certain tenants."

Thereafter, the plaintiffs appealed to the Appellate Court, and we transferred the appeal to this court pursuant to Practice Book § 4023 and General Statutes § 51-199 (c). On appeal, the plaintiffs renew their claim that the enforcement of the regulation contravenes the express language of the deed conveying Pratt Street to the city. The plaintiffs also claim that the regulation is an unlawful exercise of the city's police power because it serves no legitimate public purpose and, further, because it constitutes a taking under the state and federal constitutions, thereby entitling the plaintiffs to just compensation. We disagree and, consequently, affirm the judgment of the trial court.

I

The plaintiffs first contend that enforcement of the regulation is unlawful because it violates the condition in the deed conveying Pratt Street to the city, which mandates that the land be used "for the purpose of a road and for no other purpose." Specifically, they claim that use "for the purpose of a road" necessarily contemplates unrestricted vehicular access. We disagree.

"The principles governing the construction of instruments of conveyance are well established. In construing a deed, a court must consider the language and terms of the instrument as a whole. . . . Our basic rule of construction is that recognition will be given to the expressed intention of the parties to a deed . . . and that it shall, if possible, be so construed as to effectuate the intent of the parties. . . . In arriving at the intent expressed . . . in the language used, however, it is always admissible to consider the situation of the parties and the circumstances connected with the transaction, and every part of the writing should be considered with the help of that evidence." (Internal quotation marks omitted.) *Lakeview Associates* v. *Woodlake Master Condominium Assn., Inc.*, 239 Conn. 769, 780, 687

A.2d 1270 (1997). Moreover, "the words [in the deed] are to be given their ordinary popular meaning, unless their context, or the circumstances, show that a special meaning was intended." *Lake Garda Improvement Assn.* v. *Battistoni*, 160 Conn. 503, 512, 280 A.2d 877 (1971). "Finally, our review of the trial court's construction of the instrument is plenary." *Lakeview Associates* v. *Woodlake Master Condominium Assn., Inc.*, supra, 781.

Application of these principles to the facts of this case supports the trial court's conclusion that the regulation does not contravene the deed's requirement that Pratt Street shall be used solely "for the purpose of a road." First, the plaintiffs point to no other language in the deed to suggest that the original parties to the conveyance intended that the road shall remain open to vehicular traffic at all times and under all circumstances. Furthermore, the plaintiffs presented no evidence at trial regarding the circumstances surrounding the original conveyance of Pratt Street that supports their claim regarding the parties' intent. Accordingly, the plaintiffs may prevail only if they can establish that, in common parlance, the word "road" connotes a thoroughfare that necessarily is open to vehicular traffic at all times. In ascertaining the common usage of the word "road," we look to its dictionary definition. See, e.g., *Lakeview Associates* v. *Woodlake Master Condominium Assn., Inc.*, supra, 239 Conn. 781.

A "road" is defined generally as "an open way or public passage for vehicles, persons, and animals: a track for travel or transportation to and fro serving as a means of communication between two places usually having distinguishing names. . . ." Webster's Third New International Dictionary. In common parlance, therefore, a "road" is a thoroughfare intended to facilitate travel, including vehicular travel. Nothing in the

relevant dictionary definition of the word "road" sug-
gests, however, that the term contemplates
*unrestricted* vehicular use. Contrary to the plaintiffs'
claim, therefore, the word "road," in ordinary parlance,
does not connote a thoroughfare that necessarily
remains open to all vehicular traffic at all times. Rather,
the common meaning of the word "road" supports the
city's contention that the deed requires it merely to
maintain Pratt Street as a public way and not, as the
plaintiffs claim, that the city never may close the street
to vehicular traffic.

Furthermore, the plaintiffs have not identified any
case law, nor have we discovered any, to substantiate
the interpretation that they espouse.[17] The sole author-
ity upon which the plaintiffs do rely, *Lake Garda
Improvement Assn.* v. *Battistoni*, supra, 160 Conn. 503,
does not support their claim. In *Lake Garda Improve-
ment Assn.*, we distinguished between a "road" and a
"roadway" for purposes of determining the boundaries
of a parcel of property that had been conveyed by deed
and, in so doing, we noted that "[a] road . . . usually
refers to that portion of a roadway over which vehicular
traffic passes." Id., 512. Contrary to the plaintiffs' claim,
however, our observation in *Lake Garda Improvement
Assn.* regarding the physical distinction between a

[17] Although courts in other jurisdictions have defined the word "road"
in various manners; see, e.g., *Northwestern Telephone Exchange Co.* v.
*Minneapolis*, 81 Minn. 140, 154, 86 N.W. 69 (1900) (" 'a public way for
passage or travel; a strip of ground appropriated for travel, forming a line
of communication between different places; a highway, hence any similar
passage for travel public or private' "); *State ex rel. Wabash Railway Co.*
v. *Public Service Commission*, 340 Mo. 225, 237, 100 S.W.2d 522 (1936)
("nothing more than a strip of ground set aside, improved and dedicated
to the public for use as a passageway"); *Boykin* v. *State Highway Dept.*,
146 S.C. 483, 489, 144 S.E. 227 (1928) (" 'a place where one may ride; an
open way or public passage for vehicles, persons and animals; a track for
travel, forming a means of communication between one place and
another' "); we have discovered no case that expressly or impliedly supports
the plaintiffs' interpretation of the term as used in this deed.

"road" and a "roadway" bears no relation to the altogether different question of whether the word "road" connotes a thoroughfare to which vehicular access never may be restricted.

The plaintiffs have failed to establish that the language of the deed reflects an intent to preclude any limitation on vehicular access to Pratt Street. Therefore, we conclude that the trial court properly determined that the regulation does not violate the condition contained in the deed that Pratt Street shall be used "for the purpose of a road and for no other purpose."

## II

The plaintiffs also contend that the enforcement of the regulation by the city constitutes an unlawful exercise of the city's police power. In support of this claim, the plaintiffs assert, first, that the regulation serves no legitimate public purpose. They argue that, consequently, they are entitled to a permanent injunction prohibiting the city's enforcement of the regulation. Alternatively, they claim that the regulation interferes substantially and unreasonably with their private easement of access, and that it has caused a significant decline in the properties' value. They contend that, as a consequence, the street closings constitute a taking of their property for which they are entitled to fair compensation under the federal and state constitutions.[18] We disagree.

## A

We turn first to the plaintiffs' claim that the regulation fosters no legitimate state interest and, therefore, constitutes an unlawful exercise of the city's police power.

[18] The plaintiffs have not provided an independent analysis of their takings claim under the state constitution. For purposes of this appeal, therefore, we assume, without deciding, that the plaintiffs are entitled to the same level of protection under article first, § 11, of the state constitution as they are under the fifth amendment to the federal constitution.

Our resolution of this claim is governed by well established principles. "All private property is held subject to the police power of the state . . . and its use may be regulated in the interest of the public health, safety or welfare." *St. John's Roman Catholic Church Corp.* v. *Darien,* 149 Conn. 712, 723, 184 A.2d 42 (1962). " 'The concept of the public welfare is broad and inclusive . . . . The values it represents are . . . physical [and] aesthetic as well as monetary.' " *Figarsky* v. *Historic District Commission,* 171 Conn. 198, 207–208, 368 A.2d 163 (1976). Thus, the police power properly may be used to promote "the economic welfare of the community." *Gionfriddo* v. *Windsor,* 137 Conn. 701, 706, 81 A.2d 266 (1951). Furthermore, "[t]hat the [s]tate may under the police power regulate travel upon the public highways cannot be doubted." *Silver* v. *Silver,* 108 Conn. 371, 377, 143 A. 240, aff'd, 280 U.S. 117, 50 S. Ct. 57, 74 L. Ed. 221 (1928).

As the trial court concluded, the city, in adopting the regulation as part of its redevelopment efforts, sought to preserve the "historical integrity and ambience of Pratt Street and to maximize its viability as a commercial center by insuring pedestrian safety and improving the business of establishments located there."[19] As part of its planning function, the city had conducted extensive studies during the 1980s analyzing its downtown business district to assist it in devising plans to stimulate and manage growth.[20] Recognizing that "[a] healthy

---

[19] The plaintiffs assert that the regulation was not enacted for reasons of pedestrian safety. Contrary to this claim, the record contains substantial evidence indicating that the city's concern for pedestrian safety was a factor in its decision to adopt the regulation.

[20] The city introduced the following studies into evidence: Pratt Street Project (1987); Central Downtown Urban Design Plan, Hartford, Connecticut (1986); Hartford Planning Dept., Downtown Development Plan (1984); Urban Land Institute, An Evaluation of Downtown Retail Development Strategies (1983); and Project for Public Spaces, Inc., Downtown Hartford: Managing for Change (1980).

downtown is vital for a healthy City"; Hartford Planning Dept., Downtown Development Plan (1984) p. 1; the city established the goals of "increas[ing] the tax base . . . [in a manner consistent with the] long-term economic health of the City"; id.; and "eas[ing] vehicular access and reduc[ing the] traffic congestion . . . which threatens the health and safety of Hartford residents . . . ." Id., p. 2. Pratt Street, identified as a small, active shopping street and an important east-west pedestrian artery connecting the primary retail centers on Main Street and at the Civic Center, was viewed as an integral part of this plan. See id., pp. 36, 56. Studies of downtown pedestrian traffic revealed that peak pedestrian use of Pratt Street, contributing to significant congestion on sidewalks, occurred from 11:30 a.m. to 1:30 p.m., and from 4 p.m. to 4:30 p.m. Id., pp. 19–21. The city concluded that it could encourage pedestrian use of Pratt Street both by restoring the street to its historic state, for which the city procured the $2.45 million state grant, and by prohibiting the use of vehicles during the midday hours. See Halcyon Ltd., "Retail Concept and Design Parameters for Pratt Street—People Density/Car Density," in Pratt Street Project (1987). The vehicular prohibitions, moreover, would enhance pedestrian safety. In light of these considerations, it is manifest that the regulation, adopted in response to comprehensive studies and intended both to improve the city's economic well-being and to ensure the safety of persons patronizing downtown business establishments, serves purposes that are central to effective municipal governance. Contrary to the plaintiffs' claim, therefore, the regulation represents a legitimate use of the city's police power to advance economic, aesthetic and safety-related goals.

B

We next must determine whether the street closings have impaired the plaintiffs' access easement to such

a degree that, as the plaintiffs contend, they are constitutionally entitled to compensation from the city. We also are not persuaded by this claim.

It is well settled that, where the state, in the exercise of its police power, "authorizes a physical occupation of property (or actually takes title), the Takings Clause generally requires compensation." *Yee* v. *Escondido*, 503 U.S. 519, 522, 112 S. Ct. 1522, 118 L. Ed. 2d 153 (1992).[21] Where, however, as in this case, the government entity "merely *regulates* the use of property, compensation is required only if considerations such as the purpose of the regulation or the extent to which it deprives the owner of the economic use of the property suggest that the regulation has unfairly singled out the property owner to bear a burden that should be borne by the public as a whole." (Emphasis added.) Id., 522–23. Thus, "a regulatory taking—also known as inverse condemnation—occurs when the purpose of government regulation and its economic effect on the property owner render the regulation substantially equivalent to an eminent domain proceeding and, therefore, require the government to pay compensation to the property owner." *Southview Associates, Ltd.* v. *Bongartz*, 980 F.2d 84, 93 n.3 (2d Cir. 1992), cert. denied, 507 U.S. 987, 113 S. Ct. 1586, 123 L. Ed. 2d 153 (1993); see *First English Evangelical Lutheran Church* v. *Los Angeles County*, 482 U.S. 304, 315, 107 S. Ct. 2378, 96 L. Ed. 2d 250 (1987) (landowner entitled to bring action in inverse condemnation as result of self-executing character of takings clause).

While " '[a]ll property is held subject to the right of government to regulate its use in the exercise of the

[21] We note that compensation is required when a property owner suffers a permanent, physical occupation of his or her property, "no matter how minute the intrusion, and no matter how weighty the public purpose behind it . . . ." *Lucas* v. *South Carolina Coastal Council*, 505 U.S. 1003, 1015, 112 S. Ct. 2886, 120 L. Ed. 2d 798 (1992).

police power' "; *Figarsky* v. *Historic District Commission,* 171 Conn. 198, 206, 368 A.2d 163 (1976); "if regulation goes too far, it will be recognized as a taking." (Internal quotation marks omitted.) *Lucas* v. *South Carolina Coastal Council,* 505 U.S. 1003, 1014, 112 S. Ct. 2886, 120 L. Ed. 2d 798 (1992). In analyzing regulatory action to determine whether it "goes too far," we are mindful that the difference between a regulation that results in a compensable taking and one that does not generally is a matter of degree. *Luf* v. *Southbury,* 188 Conn. 336, 349, 449 A.2d 1001 (1982). Although at one extreme a regulation may deprive an owner of the beneficial use of property so as to constitute a practical confiscation, thereby requiring compensation; see *Lucas* v. *South Carolina Coastal Council,* supra, 1015; *Bauer* v. *Waste Management of Connecticut, Inc.,* 234 Conn. 221, 256, 662 A.2d 1179 (1995); if a regulation results in something less than a practical confiscation, "the determination of whether a taking has occurred must be made on the facts of each case with consideration being given not only to the degree of diminution in the value of the land but also to the nature and degree of public harm to be prevented and to the alternatives available to the landowner. . . . The financial effect on a particular owner must be balanced against the health, safety and welfare of the community." (Internal quotation marks omitted.) *Bauer* v. *Waste Management of Connecticut, Inc.,* supra, 256; see *Keystone Bituminous Coal Assn.* v. *DeBenedictis,* 480 U.S. 470, 492, 107 S. Ct. 1232, 94 L. Ed. 2d 472 (1987) (determination of whether regulatory action constitutes taking necessarily requires weighing of private and public interests).

Thus, when reviewing a takings claim based upon an alleged infringement of an owner's legal right of access to property, a court must ascertain the degree to which such access is impaired by the regulatory action; see, e.g., *Colorado Dept. of Highways* v. *Davis,* 626 P.2d 661, 664 (Colo. 1981); including the extent to which the

regulation deprives the owner of a reasonably convenient and suitable means of access. See, e.g., *Falls Riverway Realty, Inc.* v. *Niagara Falls*, 732 F.2d 38, 40 (2d Cir. 1984); *Johnson* v. *United States*, 479 F.2d 1383, 1391 (Ct. Cl. 1973); *Palm Beach County* v. *Tessler*, 538 So. 2d 846, 847 (Fla. 1989); *DuPuy* v. *Waco*, 396 S.W.2d 103, 109 (Tex. 1965). Although we consistently have held that "[a] landowner who, as a result of governmental action, suffers a total and permanent loss of his right of access to the public way . . . is entitled to recover damages"; *Luf* v. *Southbury*, supra, 188 Conn. 342; see *Slavitt* v. *Ives*, 163 Conn. 198, 207, 303 A.2d 13 (1972) (destruction of sole right of access to landlocked property constitutes taking); *Cone* v. *Waterford*, 158 Conn. 276, 279–80, 259 A.2d 615 (1969) (discontinuance of road providing property owner with only practical means of access amounts to taking); "some impairment of access rights and some diminution in the total value of property do not, without more, justify a conclusion that there has been an unconstitutional taking . . . ." (Citations omitted.) *Luf* v. *Southbury*, supra, 354.[22]

Application of these principles to the facts of this case supports the trial court's conclusion that the street closings do not constitute a taking of the plaintiffs' property. According to the trial testimony adduced by the plaintiffs, the restrictions placed upon the use of Pratt Street pursuant to the regulation have made access to the properties, at certain times, somewhat more inconvenient for at least some of the consuming public, thereby causing some degree of tenant dissatisfaction. This, the plaintiffs claim, has resulted in higher vacancy rates and lower rental rates, causing a decline in the value of the properties from $4.5 million to $3

[22] In *Luf* v. *Southbury*, supra, 188 Conn. 350–54, we concluded that the plaintiffs, who claimed that the defendant town's discontinuance of an unimproved highway that abutted their property constituted a taking, had failed to establish a present, nonspeculative diminution in the value of their property by virtue of the town's action.

million. The plaintiffs' evidence, however, purported to establish the loss of only two tenants and one potential tenant as a consequence of the street closings. Moreover, the plaintiffs identified only two tenants for whom they claimed rental rates were reduced as a result of the city's enforcement of the regulation. In light of the paucity of evidence tending to establish a causal relationship between the street closings, on the one hand, and any decline in the value of the properties, on the other, the trial court concluded that the plaintiffs had failed to meet their burden of proving a link between the two. The trial court, moreover, expressly rejected the plaintiffs' claim that any loss in rental income was the result of the street closings.[23] Because we cannot say that the plaintiffs' evidence required a contrary determination, we will not disturb the trial court's fact-bound conclusions.[24] See, e.g., *Herbert S. Newman &*

---

[23] The plaintiffs assert that Judge Wagner was required to adopt, as a factual finding, the observation made by Judge Freed at the conclusion of the temporary injunction hearing that the plaintiffs had "suffered immeasurably" as a result of the street closings. They argue that, had Judge Wagner accepted Judge Freed's characterization of the harm suffered by the plaintiffs, he could not have concluded properly that the plaintiffs had failed to meet their burden of proof with respect to their takings claim. We disagree with this argument for several reasons. First, in light of the fact that Judge Freed denied the plaintiffs' application for temporary injunctive relief because they had failed to establish either of their two legal claims, his statement regarding the nature of the harm suffered by the plaintiffs is dicta. Second, at the time of the temporary injunction hearing, the plaintiffs had not yet raised a takings claim; consequently, Judge Freed's observation regarding the harm caused by the street closings was wholly unrelated to the analysis underlying such a claim. Finally, and most importantly, we emphasize that Judge Wagner, in rejecting the plaintiffs' takings claim, considered not only the transcript of the testimony adduced at the temporary injunction hearing, but also the testimony of Samuel Cohen, Daniel Cohen and Jonathan Cohen, as well as the testimony of various of the plaintiffs' current and former tenants. Contrary to the plaintiffs' contention, therefore, Judge Wagner properly conducted an independent evaluation of the credibility of the witnesses and the weight of the evidence to determine, for himself, whether the plaintiffs had met their burden of proving their takings claim.

[24] We note that "[t]he financial burden imposed on a landowner by a regulation is measured by the extent to which the regulation interferes with the property owner's reasonable investment-backed expectations of use of

*Partners, P.C.* v. *CFC Construction Ltd. Partnership*, 236 Conn. 750, 762, 674 A.2d 1313 (1996) (trial court's factual findings binding on this court unless clearly erroneous in light of all evidence).

We note, furthermore, that the limited nature of the impairment to the plaintiffs' access easement caused by the street closings lends support to the trial court's conclusion regarding the plaintiffs' failure to substantiate their claim of economic loss.[25] The regulation restricts vehicular access for only three hours each weekday, and for only a portion of the year. At all other times, vehicles are free to travel on Pratt Street without restriction, and the properties are fully accessible by foot at all times. Moreover, persons seeking access to the properties when the vehicular restrictions are in force may, by obtaining motor transportation either to the intersection of Pratt and Main Streets or to the intersection of Pratt and Trumbull Streets, shorten their walk to the properties to a distance of less than one city block.[26] Thus, although the street closings may,

the property. . . . A regulation does not constitute a compensable taking if it does not infringe on such reasonable investment-backed expectations." *Bauer* v. *Waste Management of Connecticut, Inc.*, supra, 234 Conn. 257. Because the plaintiffs have failed to establish that the street closings have resulted in *any* economic loss, we are not required even to address the plaintiffs' reasonable investment-backed expectations.

[25] The plaintiffs cite to *D'Addario* v. *Commissioner of Transportation*, 180 Conn. 355, 429 A.2d 890 (1980), in support of their claim that anything less than unrestricted access to the properties amounts to a compensable taking. We disagree. In *D'Addario*, we sustained an award of damages to the owner of undeveloped land resulting from the state's temporary appropriation of a constructive easement of access where the state, during a period of more than two years, restricted the owner's use of his driveway due to public road construction. We observed that the owner, as a result of being denied unrestricted access to his property, had been unable to develop his property commercially and, consequently, had been deprived of the highest and best use of the property for over two years. Id., 368. The case before us, by contrast, does not involve the restriction of the right to develop land, nor can it reasonably be maintained that the regulation deprives the plaintiffs of the highest and best use of the properties.

[26] In support of their takings claim, the plaintiffs rely on cases in which the challenged regulatory action caused the landowner to suffer a complete

at times, pose some minor inconvenience to persons seeking access to the properties, the plaintiffs have failed to prove that they have been "unfairly singled out . . . to bear a burden that should be borne by the public as a whole." *Yee* v. *Escondido*, supra, 503 U.S. 522–23.

The judgment is affirmed.

In this opinion the other justices concurred.

---

denial of all vehicular access to the subject property for months or even years. See, e.g., *Stock* v. *Cox*, 125 Conn. 405, 419, 6 A.2d 346 (1939) (taking occurred where land condemned for highway bisected property, completely cutting off access from portion of property until highway construction completed); *DeKalb County* v. *Cowan*, 151 Ga. App. 753, 261 S.E.2d 478 (1979) (temporary but complete loss of access to property resulting in destruction of established business constitutes taking). Because the regulation at issue in this case prohibits vehicular access to Pratt Street for only a small portion of each weekday, and not for any extended period of time, these cases are inapposite.

The plaintiffs also contend that their takings claim is supported by several cases from other jurisdictions in which the permanent closing of a street to vehicular traffic has been deemed to be a taking. See *Fargo* v. *Fahrlander*, 199 N.W.2d 30, 34 (N.D. 1972) (abutting property owners entitled to compensation under state constitution for permanent closure of three blocks of street to create pedestrian mall); *Wolfe* v. *Providence*, 77 R.I. 192, 206–208, 74 A.2d 843 (1950) (permanent ban of all through vehicular traffic and designation of use of portion of street solely for parking was taking, entitling abutting business to compensation); see also *Gengarelly* v. *Glen Cove Urban Renewal Agency*, 69 App. Div. 2d 524, 526–27, 418 N.Y.S.2d 790 (1979) (remanding for determination of whether "suitable access" was denied abutting property owner, giving rise to action in eminent domain, where street closure for pedestrian mall allowed vehicular access to emergency vehicles only); but see *Boulder* v. *Kahn's, Inc.*, 190 Colo. 90, 94, 543 P.2d 711 (1975) (four block permanent closure of street for pedestrian mall, restricting access to all but emergency vehicles, and to delivery vehicles except before 10 a.m. and after 4 p.m., not sufficiently unreasonable or substantial to constitute taking). We disagree that these cases compel a conclusion that, in the far different circumstances of this case, the plaintiffs are entitled to compensation. A regulation that permanently bans all vehicular travel over a street gives rise to a far greater impairment of an abutting owner's easement rights than does a regulation, like the instant one, that results in the closing of a street to vehicular traffic for a few hours each day, Monday through Friday, for a portion of the year.