CORNFIELD POINT ASSOCIATION *v.* TOWN OF OLD
SAYBROOK ET AL.
(AC 25316)
(AC 25317)
(AC 25318)

Lavery, C. J., and Gruendel and Peters, Js.

Argued February 22—officially released September 27, 2005

*Richard D. Carella,* for the appellant (plaintiff).

*Jeffrey J. Mirman,* for the appellants (defendant James Keating et al.).

*John S. Bennet,* for the appellants (defendant Virginia Dimmock et al.).

*Michael E. Cronin, Jr.,* for the appellee (named defendant).

*Richard Blumenthal,* attorney general, and *Kimberly P. Massicotte* and *David H. Wrinn,* assistant attorneys general, filed a brief for the state of Connecticut as amicus curiae.

*Opinion*

GRUENDEL, J. In this action to quiet title to road ends that abut a beach along Long Island Sound, the principal issue is whether the defendant town of Old Saybrook (town), in which the road ends are located, obtained fee simple title to these properties by conveyances in the form of quitclaim deeds. The plaintiff property owners association, Cornfield Point Association (association), claims that the town received less than a fee interest by those deeds and sought to prevent the town from effecting certain improvements to the road ends. The association claimed that the town's planned uses for the road ends were inconsistent with the purpose for which they had been conveyed and impaired certain rights conferred on the association by a special act of the legislature. The defendant abutting landowners, by way of counterclaims and cross complaints, alleged that regardless of the town's interest, they had obtained title to three of the road ends by adverse possession. The trial court rendered judgment quieting title in the town, and the landowners and the association have filed separate appeals.

The following facts and procedural history are relevant to our discussion of the issues on appeal. The road ends in question are strips of land forty feet wide and of varying lengths located at the ends of nine roads in Cornfield Point. The travel portion of each road terminates at its intersection with a perimeter road, and the road ends are short extensions of each road across the perimeter road onto the area abutting the association's reserved beach on Long Island Sound. The road ends are located at East Lane, Cottage Road, Saltaire Drive, Clearwater Road, Belleaire Drive, Mohican Road, Gates Road, Billow Road and Uncas Road.[1] They are shown

[1] As stated in the trial court's November 26, 2003 memorandum of decision: "This lawsuit initially concerned ten road ends located at Cornfield Point. The parties have . . . filed a stipulated judgment with respect to the road end at Town Beach Road."

on a map dated November, 1922, and entitled "Cornfield Point Beach Club." The map, introduced into evidence as plaintiff's exhibit two, can be found in the town's land records in map volume one, pages 37 and 38, map numbers 130 and 131.

In its memorandum of decision dated November 26, 2003, the court found that "prior to 1921, Elizabeth C. J. Beach owned the entire portion of Cornfield Point south of Town Beach Road . . . . On November 21, 1921, Beach conveyed to Gilbert Pratt, by warranty deed, a fee simple interest in twenty-five acres comprising the westerly section of Cornfield Point south of Town Beach Road ('the west parcel'). On August 16, 1922, Beach conveyed to James Jay Smith, by warranty deed, a fee simple interest in 33 acres east of the Pratt parcel ('the east parcel'). In November 1922, both of these parcels were subdivided into lots with various roads designated. On June 19, 1930, Smith conveyed by warranty deed to the Shore and Lake [Corporation] his fee simple interest in the east parcel. . . .

"[I]n 1932, Pratt held fee simple title in the west parcel, including the roads and road ends at Gates Road, Billow Road and Uncas Road and . . . the Shore and Lake [Corporation] held fee simple title to the east parcel, including the roads and road ends at East Lane, Cottage Road, Saltaire Drive, Clearwater Road, Belleaire Drive and Mohican Road. . . .

"On September 28, 1932, the Shore and Lake [Corporation] executed a quitclaim deed that conveyed to the town of Old Saybrook 'for highway purposes' all its right and title in the streets, roads and drives known as East Lane, Cottage Road, Saltaire Drive, Clearwater Road, Belleaire Drive and Mohican Road.[2] On October

---

[2] The deed provides: "KNOW ALL MEN BY THESE PRESENTS: THAT THE SHORE & LAKE CORPORATION, a Corporation organized and existing under the laws of the State of Connecticut and having its principal office in the Town of Westbrook, County of Middlesex in said state, for divers good causes and considerations thereunto moving, especially for one dollar

### 3, 1932, Pratt similarly executed a quitclaim deed that

received to its full satisfaction of THE TOWN OF OLD SAYBROOK, County of Middlesex, State of Connecticut, has remised, released, and forever quit-claimed, and does by these presents, for itself and successors, justly and absolutely remise, release, and forever QUIT-CLAIM unto the said TOWN OF OLD SAYBROOK, its successors and assigns forever for highway purposes, all such right and title as it, the said Releasor, has or ought to have in or to the following streets, roads, drives known as SUMMERFIELD ROAD, WILDWOOD ROAD, SEA BREEZE ROAD, RIDGE ROAD, MOHICAN ROAD, BELLEAIRE DRIVE, CLEARWATER ROAD, SALTAIRE DRIVE, COTTAGE ROAD, EAST LANE, SEA LANE, and that portion of HARTLANDS DRIVE LYING BETWEEN MAPLE AVENUE AND THE WESTERN BOUNDARY OF LOT NO. TWENTY (20), AND THAT PORTION OF INDIANOLA DRIVE LYING BETWEEN TOWN BEACH ROAD AND THE STATE HIGHWAY PORTION OF INDIANOLA DRIVE.

"Reserving and excepting however, to Allan T. Speirs and John J. Speirs, their heirs, representatives and assigns, the right and easement of laying, maintaining and operating water mains, pipes and connections in said streets, as already laid or as may hereafter be necessary for supplying water to residents of said section, and of entering thereon for the purposes hereinbefore set forth.

"Reserving also to the Shore & Lake Corporation of Westbrook, Connecticut, their successors and assigns, the right and easement of laying, maintaining and operating sewer pipes and connections in said streets as already laid or as may hereafter be necessary to lay for protecting the wells and water supply of residents of said section and of entering thereon for the purposes hereinbefore set forth.

"The hereinbefore described streets, roads, and drives are located and shown on a map entitled 'Plan of Cornfield Point Beach Club,' in the Town of Old Saybrook, County of Middlesex, and State of Connecticut, Survey made by Daboll & Crandall, Civil Engineers, and plan filed December 19th, 1927 in the office of the Town Clerk of the Town of Old Saybrook.

"TO HAVE AND TO HOLD, the premises unto it, the said TOWN OF OLD SAYBROOK, and to its successor and assigns, to the only use and behoof of the said TOWN OF OLD SAYBROOK, its successors and assigns forever, so that neither the said Releasor nor any other person or persons in its name and behalf, shall or will hereafter claim or demand any right or title to the premises or any part thereof, but they and every of them shall by these presents be excluded and forever barred.

"IN WITNESS WHEREOF, The Shore & Lake Corporation has caused this deed to be executed and its corporate seal to be affixed this twenty-eighth day of September, in the year of our Lord nineteen hundred and thirty-two, by James Jay Smith, its President duly authorized.

"Signed, Sealed and Delivered in the presence of
"Maude Brundage          THE SHORE & LAKE CORPORATION
"Helen M. Silkworth      BY James Jay Smith, President"

conveyed to the town of Old Saybrook 'for highway purposes' all [his] right and title in the streets, roads and drives known as Gates Road, Billow Road and Uncas Road."[3] On that same day, at an annual town meeting, the town voted "[t]o accept the roads at Cornfield Point, including Town Beach Road, so called."

Six years later, at a December 9, 1938 special town meeting, the town's board of selectmen voted to "discontinue as highways, streets, or roads" the road ends

---

[3] The deed provides: "KNOW ALL MEN BY THESE PRESENTS, THAT I, GILBERT PRATT of the City and County of New York, State of New York, for divers good causes and considerations thereunto moving, especially for one dollar received to my full satisfaction of THE TOWN OF OLD SAY-BROOK, County of Middlesex, State of Connecticut, have remised, released, and forever quit-claimed, and do by these presents, for myself and heirs, justly and absolutely remise, release, and forever QUIT-CLAIM unto the said TOWN OF OLD SAYBROOK, its successors and assigns forever, for highway purposes, all such right and title as I, the said Releasor have or ought to have in or to the following streets, roads and drives known as WEST SHORE DRIVE, POINT ROAD, BILLOW ROAD, UNCAS ROAD, GATES ROAD, PRATT ROAD AND HARTLANDS DRIVE, all as located and shown on map entitled 'Plan of Cornfield Beach Point Club' in the Town of Old Saybrook, Connecticut, Survey made by Daboll & Crandall, Civil Engineers of New London, Connecticut, and Plan filed December 19th, 1927, in the office of the Town Clerk of Old Saybrook.

"Reserving, however, to Allan T. Speirs and John J. Speirs, their heirs, representatives and assigns, the right and easement of laying, maintaining and operating water mains, pipes and connections, in said streets, as already laid or as may hereafter be necessary for supplying water to residents of said section, and of entering thereon for the purposes hereinbefore set forth.

"TO HAVE AND TO HOLD, the premises unto it, the said TOWN OF OLD SAYBROOK, and to its successors and assigns, to the only use and behoof of the said TOWN OF OLD SAYBROOK, its successors and assigns forever, so that neither I, the said Releasor nor any other person or persons in my name and behalf, shall or will hereafter claim or demand any right or title to the premises or any part thereof, but they and every of them shall by these presents be excluded and forever barred.

"IN WITNESS THEREOF, I have hereunto set my hand and seal this [3rd] day of October, in the year of our Lord nineteen hundred and thirty-two.

"Signed, Sealed and Delivered in the presence of

"Susan Eliot Pratt

"Gilbert Pratt (L. S.)

"Charles S. Gates . . . ."

in question, which had been damaged by a storm earlier that year.[4] As required by then General Statutes § 1442 (1930 Rev.),[5] now General Statutes § 13a-49, the board of selectmen submitted their vote to a town meeting for approval. The majority of those in attendance at the town meeting, however, did not approve the board's proposed discontinuance. Instead, they voted that the town "repair and put in proper condition the road ends at Cornfield Point, as they were before the storm . . . ."

Soon thereafter, at a special town meeting held on January 27, 1939, those in attendance "vote[d] their approval . . . for the repairing and filling of the road-ends at Cornfield Point . . . [t]he money for such . . .

[4] Certified minutes of the special town meeting, introduced as an exhibit in the trial proceedings, provide in relevant part: "VOTED that the Selectmen hereby discontinue as highways, streets, or roads certain dead-end parts or portions of certain streets or roads as they are laid out, shown and designated on a certain map entitled 'Cornfield Point Beach Club Property in the Town of Old Saybrook, Connecticut, Jas. Jay Smith Co., Developers, Dated November, 1922, surveyed and drawn by Daboll and Crandall, Civil Engineers and Surveyors,' and recorded in the Office of the Town Clerk of said Old Saybrook on Map pages 130 and 131, which highways, streets and roads are set forth and described by reference to said map in two certain deeds conveying for highway purposes the said streets and roads to the Town of Old Saybrook by the Shore and Lake Corporation by Quit-Claim Deed, recorded October 5, 1932 in Vol. 37, page 207 and by Gilbert Pratt by Quit-Claim deed recorded October 5, 1932, Vol. 37, page 209.

"The parts or portions to be discontinued of the following named roads or streets designated on the aforementioned map as East Lane, Cottage Road, Saltaire Drive, Clearwater Road, Belleaire Drive, Mohican Road and Gates Road, lying and being between the southerly line of Sea Lane and a line marked 'top of Bank' on said map; Billow Road and Uncas Road lying and being between the westerly line of West Shore Drive and a line marked 'Top of Bank' on aforesaid map."

[5] General Statutes § 1442 (1930 Rev.) provides in relevant part: "The selectmen of any town may, *with its approbation*, by a writing signed by them, discontinue any highway or private way, or land dedicated as such, therein, except when laid out by a court or the general assembly, and except where such highway is within a city, or within a borough having control of highways within its limits . . . ." (Emphasis added.)

repairs to road-ends to be used from the Dirt Road fund."

On February 10, 1939, the Shore and Lake Corporation executed another quitclaim deed. This deed purportedly conveyed to the town all its right and title in the road ends and all its right and title in so much of the land marked "Reserved Beach" on the aforementioned map as was necessary to enable the town to construct a seawall where the southern boundaries of the road ends met the northern boundary of the reserved beach. The deed also reserved to the Shore and Lake Corporation the right to pass and to repass, for all purposes, over the lands described therein in order to access the reserved beach. The purpose of the deed, as stated therein, was "to convey to the [town] all the land necessary to enable the [town] to construct bulkheads or sea wall along the southerly line of [the road ends] . . . ."[6]

---

[6] Given our analysis of the 1932 deeds in part I A and B, and our ultimate conclusion in part I B that they conveyed fee simple title in the road ends to the town, we conclude that the 1939 deed did not convey nor could it have conveyed the road ends to the town. The 1939 deed simply (1) conveyed to the town enough of that land between the seaward termini of the road ends and the land marked "Reserved Beach" so as to allow the town to construct a seawall where the southern boundaries of the road ends met the northern boundary of the reserved beach and (2) reserved in the Shore and Lake Corporation an access easement over the land conveyed by the deed.

In its entirety, the 1939 deed provides: "KNOW ALL MEN BY THESE PRESENTS that THE SHORE AND LAKE CORPORATION, a corporation organized and existing under the laws of the State of Connecticut and located in the Town of Clinton, County of Middlesex and State of Connecticut, for the consideration of one dollar and other valuable considerations received to its full satisfaction of THE TOWN OF OLD SAYBROOK, a municipal corporation having its corporate limits within said County of Middlesex, does by these presents remise, release and forever quitclaim unto said Town of Old Saybrook, its successors and assigns, all right, title, interest, claim and demand whatsoever which the said releasor has or ought to have in or to all that portion of Belleaire Drive, Clearwater Road, Saltaire Drive, Cottage Road and East Lane, lying between Sea Lane and land marked 'Reserved Beach,' and that portion of Mohican Road lying between Hartlands Drive and 'Reserved Beach,' all of said streets having a width of forty (40) feet and shown upon map entitled 'Cornfield Point Beach Club, Property in the

On July 13, 1943, the legislature passed a special act incorporating the association and making it a body politic. Spec. Acts No. 467, § 1. The act vested in the association, among other things, "exclusive charge and control of all roads within the limits as shown on the maps referred to in section two [of the act] which are not under state or town control."[7] Spec. Acts No. 467, § 12. The act also stated that "[i]f any by-laws or regulation adopted by The Cornfield Point Association shall conflict with any lawful ordinance of the town of Old Saybrook, the ordinance of said town shall prevail and

Town of Old Saybrook, Conn., Jas. Jay Smith Co., Developers, Old Saybrook, Conn. and New York City, All "Beach Front" Reserved for Use of Lot Owners, We hereby certify that this Plan, and the Surveys from which it was made, are substantially correct. Daboll and Crandall.' filed in the office of the Town Clerk of Old Saybrook on December 19, 1927, and so much of the land marked 'Reserved Beach' lying southerly of said street ends as may be necessary to enable the releasee to construct the foundation of a sea wall along the northerly line of said 'Reserved Beach' at the southerly end of said streets; RESERVING to the releasor and to all other who have heretofore acquired or may hereafter acquire the right to pass and to repass for all purposes over the above-described land to land marked 'Reserved Beach' on said map.

"The purpose of this deed is to convey to the releasee all the land necessary to enable the releasee to construct bulkheads or sea wall along the southerly line of said streets and in continuation of line of bulkheads or sea wall constructed by property owners along the northerly line of said 'Reserved Beach.'

"TO HAVE AND TO HOLD the premises, with all the appurtenances, unto said releasee, its successors and assigns forever, so that neither the said releasor nor its successors and assigns, nor any person under it or them, shall hereafter have any claim, right or title in or to the premises, or any part thereof, but therefrom it and they are by these presents forever barred and secluded, except as noted above.

"IN WITNESS WHEREOF The Shore and Lake Corporation has caused these presents to be executed and its corporate seal to be hereunto affixed this 10th day of February, 1939.

"Signed, sealed and delivered in the presence of:

"Edith Walker          THE SHORE AND LAKE CORPORATION

"James Jay Smith       By Avy B. Smith

"Its Treasurer"

[7] Section two of the special act specifically references the map we discussed previously. See Spec. Acts No. 467, § 2.

supersede the by-law or regulation of said association."
Spec. Acts No. 467, § 18.

Recently, the town developed plans for the improvement of seven of the nine road ends that are the subjects of this litigation. The seven road ends include those at East Lane, Cottage Road, Saltaire Drive, Clearwater Road, Belleaire Drive, Mohican Road and Gates Road. The town proposes to make those road ends more accessible and usable for the general public, primarily as scenic overlooks. The town wants to remove various hedges, fences and other alleged encroachments, and to install permanent markers identifying the boundaries of the road ends, bicycle racks, identification signs and four parking spaces, one at each of the road ends at Mohican Road, Belleaire Drive, Saltaire Drive and Cottage Road. The town also wants to install granite bollards[8] across six of the seven aforementioned road ends in order to prevent vehicles from accessing major portions of the road ends.

In a memorandum of decision dated November 26, 2003, the court found that the town possesses fee simple title to the road ends. In a second memorandum of decision dated January 29, 2004, the court found that the abutting property owners had failed to rebut the presumption that the road ends were held by the town for public use and that the road ends, in fact, were held by the town for public use.[9] The court, therefore, held that the town was immune from the abutting landowners' claims of adverse possession. In a third memoran-

---

[8] Merriam-Webster's Collegiate Dictionary (10th Ed. 1999) defines "bollard" as "any of a series of short posts set at intervals to delimit an area . . . or to exclude vehicles."

[9] At trial, in addition to the Keatings' and Dimmocks' claims of adverse possession to portions of the road ends at Clearwater Road and East Lane, additional parties, Frederick U. Conard III and Pattilyn F. Conard, claimed to possess adversely a portion of the road end at Mohican Road. The Conards did not appeal from the court's judgment rejecting their claim of adverse possession.

dum of decision dated March 15, 2004, the court ordered the town to refrain from installing bollards on the road ends because they unreasonably would interfere with the association's right of access to the beach,[10] but the court did not otherwise enjoin any of the town's proposed use of the road ends, including the installation of several parking spaces.

The defendants James Keating and Salvatrice Keating (Keatings) and the defendants Virginia Dimmock, Carolyn Lyle and M. Allen Northrup (Dimmocks) filed separate appeals challenging the trial court's judgment quieting title to the road ends on Clearwater Road and East Lane in the town.[11] The association challenges the court's quieting of title in the town to all of the road ends. They claim that certain quitclaim deeds conveyed to the town only an easement in the road ends and, therefore, that the court improperly concluded that the town possesses fee simple title to the road ends.

The Keatings and the Dimmocks also challenge the court's determination that they failed to prove title by adverse possession to the road ends at Clearwater Road and East Lane. They claim that they proved the existence of each essential element of a successful adverse possession claim against a municipality, including the requirement that the town intentionally abandoned the

---

[10] In its March 15, 2004 memorandum of decision, the trial court stated that the association, which has as its members all owners of real property located within Cornfield Point, and the town "have stipulated that [the association] has a right of access, including the right of vehicular access, over the road ends to the reserved beach. This right of access allows [the association] to reach the reserved beach from the public highways in Cornfield Point." The court noted, however, that "[t]he parties have not agreed on the source of [the association's] right of access. Since neither party points to any source of an express easement, they appear to rely on the existence of an implied easement."

[11] The Keatings, in AC 25316, appeal from the judgment only as it applies to the road end at Clearwater Road. The Dimmocks, in AC 25318, appeal from the judgment only as it applies to the East Lane road end. See footnote 9.

relevant road end portions, and, therefore, that the court improperly concluded that the town was immune from their claims of adverse possession.

In its appeal, the association also challenges the court's determination that the town could implement all of its proposed improvements to the road ends except for the installation of bollards. The association claims that (1) the court's decision improperly allows the town to use the road ends in a manner inconsistent with the purpose for which they were acquired, (2) the court improperly concluded that the town's proposed parking spaces on the road ends do not interfere with the association's right of access and (3) the court improperly held that the association's ban on public parking in the streets at Cornfield Point, as authorized by 24 Spec. Acts 311, No. 467, § 12 (1943) (Spec. Acts No. 467), does not apply to the road ends.

I

FEE SIMPLE

The association, the Keatings and the Dimmocks all claim that the court improperly concluded that the town possesses fee simple title to the road ends. In support of their claim, they argue that the 1932 deeds were dedications and merely conveyed easements over the road ends to the town for public travel or, more specifically, for highway purposes. According to the association and the property owners, (1) the express conveyance of the "roads" and not of the land on which the roads lie, (2) the language in each of the 1932 deeds indicating that the conveyance was intended "for highway purposes" and (3) the circumstances surrounding the conveyances, in particular the fact that the town voted to accept the roads at an annual town meeting held on October 3, 1932, compel the conclusion that the interest conveyed by each deed was an easement and not fee simple title. We are not persuaded.

Multiple parties in this case claim a property interest in certain road ends in their entirety or in at least portions thereof. Determining whether the court properly determined each party's interest in the road ends requires us to construe the relevant terms of the two 1932 deeds and to discern whether they express an intent to convey to the town a fee simple interest in the road ends or merely an easement over them for highway purposes.

"[W]hen interpreting the language of a deed the question is not what the parties may have meant to say, but the meaning of what they actually did say." *American Trading Real Estate Properties, Inc.* v. *Trumbull*, 215 Conn. 68, 75, 574 A.2d 796 (1990). "[T]he determination of the intent behind language in a deed, considered in the light of all the surrounding circumstances, presents a question of law on which our scope of review is plenary. . . . Thus, when faced with a question regarding the construction of language in deeds, the reviewing court does not give the customary deference to the trial court's factual inferences. . . . The meaning and effect of the [paragraphs in a deed] are to be determined, not by the actual intent of the parties, but by the intent expressed in the deed, considering all its relevant provisions and reading it in the light of the surrounding circumstances . . . . The primary rule of interpretation . . . is to gather the intention of the parties from their words, by reading, not simply a single clause of the agreement but the entire context, and, where the meaning is doubtful, by considering such surrounding circumstances as they are presumed to have considered when their minds met. . . .

"Further, [i]t is a well established principle of construction that wherever possible each part of the scrivener's phraseology should be given some import. . . . Every word, sentence and provision, if possible, is to have effect, and a construction which requires rejection

of an entire clause is not to be admitted . . . ." (Citation omitted; internal quotation marks omitted.) *Bird Peak Road Assn., Inc.* v. *Bird Peak Corp.*, 62 Conn. App. 551, 557, 771 A.2d 260, cert. denied, 256 Conn. 917, 773 A.2d 943 (2001). "In the determination of whether a particular conveyance transfers the fee or merely an easement, many courts follow the rule that the intention of the parties is to be gathered from the instrument as a whole." 23 Am. Jur. 2d 225, Deeds § 227 (2002); see *Mackie* v. *Hull*, 69 Conn. App. 538, 541, 795 A.2d 1280, cert. denied, 261 Conn. 916, 917, 806 A.2d 1055 (2002) ("[i]n construing a deed, a court must consider the language and terms of the instrument as a whole" [internal quotation marks omitted]). "Moreover, the words [in the deed] are to be given their ordinary popular meaning, unless their context, or the circumstances, show that a special meaning was intended." (Internal quotation marks omitted.) *Cohen* v. *Hartford*, 244 Conn. 206, 215, 710 A.2d 746 (1998).

As a preliminary matter, before analyzing the entire text of each deed to determine whether the court properly determined that each conveyed fee simple title in the road ends to the town, we note additional legal principles that will guide our analysis. First, at the time the deeds in this case were executed, "references to maps [had] the effect of incorporating them in the deeds referring thereto. . . . The identifying or explanatory features contained in them [were] as much a part of the deeds, and so entitled to consideration in their interpretation, as though they were expressly recited therein." (Citation omitted.) *Barri* v. *Schwarz Bros. Co.*, 93 Conn. 501, 508, 107 A. 3 (1919). This rule applies even today. See *Schwartz* v. *Murphy*, 74 Conn. App. 286, 291–92, 812 A.2d 87 (2002), cert. denied, 263 Conn. 908, 819 A.2d 841 (2003); see also General Statutes § 7-31. With this in mind, we note that the deeds in question expressly reference the map dated November, 1922,

and entitled "Cornfield Point Beach Club." That map clearly includes the road ends as part of the roads, streets and drives to which they are attached. We therefore conclude that any reference in the deeds to a road, street or drive includes the road end attached thereto.

Second, a quitclaim deed may convey fee simple title in real property if the grantor has such an estate. See *Villano* v. *Polimeni*, 54 Conn. App. 744, 737 A.2d 950 (defendant quitclaimed fee interest in property to plaintiff), cert. denied, 251 Conn. 908, 739 A.2d 264 (1999); 23 Am. Jur. 2d 255–56, supra, § 276. With that in mind, we note, as stated in the facts discussed previously, that the grantors of the 1932 deeds held fee simple title in the pertinent road ends immediately prior to executing the deeds.

Third, we note that a town may possess fee simple title to a public road. See *American Trading Real Estate Properties, Inc.* v. *Trumbull*, supra, 215 Conn. 68. The Keatings, relying on the venerable case of *Peck* v. *Smith*, 1 Conn. 103 (1814), argue that Connecticut law limits a town's interest in public roads to an easement for public passage and that the fee title to the roads is held by the adjoining landowners. Our reading of that case and of subsequent decisions on the subject, including *American Trading Real Estate Properties, Inc.*, does not support such a stark conclusion.

In *Peck* v. *Smith*, supra, 1 Conn. 103, the plaintiff appealed from the jury verdict in favor of the defendant, who, it was alleged, "contrary to the mind and will of the plaintiff, and without law or right, and with force and arms, entered into and upon the plaintiff's said land; and with the like force and arms erected upon said land one certain dram or grog shop . . . ." Id. The trial court, apparently believing that the town of Waterford possessed title to the highway, instructed the jury that if it found that the acts complained of

were done within the limits of the highway, the plaintiff could not maintain his trespass action, presumably because he was not the fee titleholder. The jury found in favor of the defendant, and the plaintiff appealed. Id., 104.

To determine whether the court's instruction was proper, the Supreme Court considered whether the plaintiff or the town possessed fee simple title in the land on which the highway was located. Five of the eight justices held that the case was to be remanded for a new trial.[12] The majority of the court did not agree, however, that the plaintiff possessed fee simple title, nor did the court conclude that fee title to a road or highway could be held only by landowners abutting the highway. Our reading of *Peck* therefore leads us to disagree with the Keatings' argument that a town's interest in a public road is always limited to an easement for public passage.

Finally, we note that dedication by quitclaim deed can be the manner by which a town acquires, in trust for the public, fee simple title to a public road. See *Derby* v. *Alling*, 40 Conn. 410, 433, 435, 438 (1873) (holding grantors renounced all claim to street and town held, in trust for public, title to street for purpose contemplated by deed); *Taylor* v. *Public Hall Co.*, 35 Conn. 430, 431 (1868) (holding that where land conveyed by warrantee deed to town for sole use and purpose as public highway, deed conveyed more than easement, and as long as premises continued to be used for highway, town had complete title in fee to land); 23 Am. Jur. 2d 25, Dedication § 25 (2002). That being said, some courts, including our Supreme Court, have held that

---

[12] Chief Justice Reeve and Justices Edmond, Trumbull, Smith and Swift voted to grant a new trial. Justices Ingersoll, Baldwin and Brainard voted to deny one. Chief Justice Mitchell, who heard argument on the appeal, but evidently died before the decision was rendered, expressed the opinion that a new trial should be denied. *Peck* v. *Smith*, supra, 1 Conn. 146.

"the estate conveyed by a deed which basically purports to convey *land* is not cut down to a mere easement by the presence of a reference to 'right of way' or a recital of a purpose consistent with an easement." (Emphasis added.) 23 Am. Jur. 2d 226, Deeds § 229 (2002); accord *American Trading Real Estate Properties, Inc.* v. *Trumbull*, supra, 215 Conn. 72–76. Moreover, even when a deed purports to convey a "road" but does not expressly purport to convey the "land" on which the road lies, we conclude that it still may be construed as passing fee simple title if the deed indicates an intention to do so. See *Mackie* v. *Hull*, supra, 69 Conn. App. 541 (language and terms of deed to be construed as a whole). Once a town acquires fee simple title to a street or road for highway purposes, it is generally said to be held in trust for the benefit of all the public *for such purposes*. See *Winchester* v. *Cox*, 129 Conn. 106, 111–12, 26 A.2d 592 (1942) (by accepting conveyances, town became bound to observe provisions in conveyances concerning use to which land was to be put); 39 Am. Jur. 2d 714–15, Highways, Streets, and Bridges § 184 (1999).[13]

A

With these principles in mind, we turn our attention to the text of each deed from 1932.[14] First, the association and the owners argue that each deed's explicit reference to "roads" and not also to the *land* on which the roads lie reflects an intention to convey only an easement and not the fee to the land. Recognizing that

[13] That is not to say that land acquired by a town for highway purposes may never be used for some other purpose. The state may take the land after making just compensation, for another purpose. "All property is, and must be, held subject to the right of the state to take and use it for public purposes; this includes property already devoted to a public use; and it is for the legislature primarily to determine when property so devoted to one public use may be taken for another." *Winchester* v. *Cox*, supra, 129 Conn. 113.

[14] See footnotes 2 and 3.

our Supreme Court in *American Trading Real Estate Properties, Inc.* v. *Trumbull*, supra, 215 Conn. 68, concluded that a deed conveyed fee simple title based in part on the fact that the deed expressly referenced its subject as "a certain narrow strip of *land*"; (emphasis in original; internal quotation marks omitted) id., 73; the association and the owners attempt to distinguish the deeds in this case by pointing out that the deeds here do not expressly reference "land," but expressly refer to "streets, roads and drives" instead. Such references, they argue, do not include the land on which those streets, roads and drives lie. Accordingly, they argue that this language reflects an intent to convey only an easement and not the fee to the land.

Even though the deeds do not expressly reference "land," other segments of the deeds describe the streets, roads and drives in a manner that we conclude includes the land on which they lie. Specifically, the latter portion of each deed twice describes the streets, roads and drives as "premises." The deed from Pratt to Old Saybrook states: "TO HAVE AND TO HOLD, the premises unto it, the said TOWN OF OLD SAYBROOK, and to its successors and assigns, to the only use and behoof of the said TOWN OF OLD SAYBROOK, its successors and assigns forever, so that neither I, the said Releasor nor any other person or persons in my name and behalf, shall or will hereafter claim or demand any right or title to the premises or any part thereof, but they and every of them shall by these presents be excluded and forever barred." The deed from the Shore and Lake Corporation to Old Saybrook uses almost the exact same language.

Following the rule that words in a deed generally are to be given their ordinary popular meaning; *Cohen* v. *Hartford*, supra, 244 Conn. 215; we note that "premises" is defined as "real estate"; Ballentine's Law Dictionary (3d Ed. 1969); or as "a tract of land with the buildings thereon"; Merriam Webster's Collegiate Dictionary

(Tenth Ed. 1999); and "is generally said to include a tract of land in the context of conveyancing . . . ." Barron's Law Dictionary (4th Ed. 1996).[15] With those definitions in mind and considering the import of other language in the deeds, which we will discuss, we conclude that reference to streets, roads and drives includes the land thereunder, which in turn reflects an intent to convey fee simple title rather than an easement. Furthermore, even if each deed consistently referred to the subject of the conveyance as "streets, roads and drives" and did not once use the term "premises," we still would conclude, for the reasons we will discuss, that the deeds express an intent to convey fee simple title to the town.

## B

As the court pointed out: "The two 1932 deeds use substantially similar language in conveying an interest in the identified roads to the town . . . . In [their respective] deed[s], the grantors, The Shore and Lake [Corporation] and Gilbert Pratt, 'justly and absolutely remise, release, and forever QUIT-CLAIM unto the said TOWN OF OLD SAYBROOK, its successors and assigns forever, for highway purposes, all such right and title as [the grantor] ha[s] or ought to have in or to the [designated] streets, roads and drives . . . .' The deed

---

[15] The word "premises" may also "signify the right, title, or interest conveyed." Barron's Law Dictionary, supra, 385. We do not conclude, however, that that is the meaning of "premises" within the context of the deeds in question. The deed from the Shore and Lake Corporation to Old Saybrook states in relevant part "that neither the said Releasor nor any other person or persons in its name and behalf, shall or will hereafter claim or demand any right or title to the premises or any part thereof . . . ." The deed from Pratt to Old Saybrook uses almost the exact same language. Given that "any right or title to" immediately precedes "the premises," we are disinclined to infer that the grantors meant to say "that neither the said Releasor nor any other person or persons in its name and behalf, shall or will hereafter claim or demand *any right or title to the [right, title, or interest conveyed]* or any part thereof . . . ." (Emphasis added.) Such a statement is redundant and, in the context of the paragraph, makes little sense.

from The Shore and Lake [Corporation] continues on to reserve to Allan T. Speirs and John J. Speirs 'the right and easement' of laying, maintaining and operating water mains, pipes and connections in the conveyed streets . . . . The deed from Pratt contains a similar reservation of a 'right and easement' to Allan T. Speirs and John J. Speirs to lay, maintain and operate water mains, pipes and connections." The deed from the Shore and Lake Corporation also reserves to itself, its successors and assigns "the right and easement of laying, maintaining and operating sewer pipes and connections" in the designated streets.

Although the language "for highway purposes" may constitute a recital of a purpose consistent with an easement, it does not, considered in the overall context of each deed, demonstrate an intent to convey only an easement to the town. Considering each deed in its entirety, we are convinced that each deed expresses an intent to convey fee simple title to the town. Looking beyond the "for highway purposes" language, the court held that each deed's specific conveyance of " 'all such right and title [as it, the said Releasor, has or ought to have]' in the designated 'streets, roads, and drives' . . . reflects an intent to convey fee simple title to the roads, rather than an intent to grant only [an easement]." We agree.

Looking beyond the "for highway purposes" language ourselves, we also note, as recited previously, that the town and its successors were to have and to hold the premises "to [their] only use and behoof . . . so that neither the [grantors] nor any other person or persons in [their] name[s] and behalf, shall or will hereafter claim or demand any right or title to the premises or any part thereof, but they and every of them shall . . . be excluded and forever barred." That additional language, like that quoted by the court, reflects an intent to convey fee simple title to the town. Barring the reser-

vations to certain parties, including the Shore and Lake Corporation, of rights and easements entitling them to lay, maintain and operate water mains, sewer pipes and connections, both Pratt and the Shore and Lake Corporation expressly renounce "*any right or title* to the premises or any part thereof . . . ." (Emphasis added.) Such language cannot be construed to reflect an intent to preserve their fee simple title.

That the Shore and Lake Corporation used the word "easement" to reserve unto itself and its successors the authority to lay, maintain and operate sewer pipes, and that both Pratt and the Shore and Lake Corporation used that same term to reserve a similar authority to the Speirs and their heirs is further evidence that the deeds conveyed fee simple title to the town. Given their apparent familiarity with the legal term "easement," the grantors just as easily could have used it to express the kind of interest they wanted to convey to the town. They chose, however, not to do so. That choice, in combination with the grantors' use of the other language previously discussed, clearly reflects an intent to convey fee simple title to the town.

In its decision, the court, drawing on reasoning from *American Trading Real Estate Properties, Inc.* v. *Trumbull*, supra, 215 Conn. 74, also held that the grantors' reservations of easement rights demonstrated an intent to convey fee simple title to the town because if their intent was merely to convey easements in the roads to the town, they would not have needed to reserve easement rights in themselves or in the Speirs. In *American Trading Real Estate Properties, Inc.*, our Supreme Court held that the deed in question conveyed fee simple title to the town, reasoning that the grantors' express reservation of a right to pass over and to cross the roadway "would have been unnecessary if the grantors had retained fee simple title to the roadway, since the right to use the property for purposes not inconsis-

tent with a nonexclusive easement would have remained with the grantors." Id., 74. In other words, where the grantor intends to retain fee simple title and to convey a nonexclusive easement to the grantee, the grantor does not have to reserve a right to use the servient premises[16] for a purpose that does not conflict with the grantee's easement rights. The grantors' having reserved a right to pass over and to cross the roadway was then, according to our Supreme Court, evidence that they were conveying fee simple title to the town; it would have been unnecessary for them to have made the reservation if their intention was to convey to the town a nonexclusive easement. See id.

The association and the owners argue, however, that the reservations in this case are distinguishable from the reservation in *American Trading Real Estate Properties, Inc.*, because Pratt and the Shore and Lake Corporation, which according to the association and the owners conveyed highway easements to the town, anticipated that the Speirs and the Shore and Lake Corporation would conduct activities that would interfere with the town's use of the roads as highways, namely, laying, maintaining and operating water mains and sewer pipes. In other words, the association and the owners argue that because the anticipated installation and maintenance of pipes beneath the roads by the Speirs and the Shore and Lake Corporation would, at least temporarily, interfere with the town's rights under the alleged highway easement, it was necessary that Pratt and the Shore and Lake Corporation expressly reserve the right to lay and maintain pipes. As such, the association and the owners argue that the reservation language here does not reflect an intent to convey fee simple title to the town but merely an intent to protect the Shore and Lake Corporation's and the Speirs' right

---

[16] "Servient premises" is defined as "[l]and owned by one person which is subject to an easement in another." Ballentine's Law Dictionary, supra.

to perform an activity that, in the absence of a reservation, would impermissibly interfere with the town's alleged easement rights.

We agree that if Pratt and the Shore and Lake Corporation had wanted to retain fee simple title, to convey highway easements to the town and to protect the ability of the Shore and Lake Corporation and the Speirs to lay pipes beneath the roads, they would have been required to reserve expressly, in some fashion, the right to lay pipes beneath the roads, as such an act could arguably be construed as interfering with the town's alleged easement rights under the deed. As indicated previously, however, we find it compelling that the grantors did not use the word "easement" to describe the interests of the town. With respect to the Shore and Lake Corporation deed, it is particularly noteworthy that the Shore and Lake Corporation, the grantor, chose to use the word "easement" to describe *its own interests*. Considering each deed in its entirety and, in particular, in light of the aforementioned language in which the grantors renounced any right or title they had or may have had, we fail to see anything that would compel us to affix to the word "easement" a meaning other than its ordinary popular meaning. See *Cohen* v. *Hartford*, supra, 244 Conn. 215. We conclude that the reservation language in both deeds reserves easements in the Shore and Lake Corporation and in the Speirs and, thus, reflects an intent to convey fee simple title to the town, the grantee.

C

There is no merit to the association's and the owners' contention that the town's vote on October 3, 1932, to accept the roads at Cornfield Point indicates that an easement was intended. Although dedication of a highway easement in 1932 required formal acceptance by the town; see General Statutes (1930 Rev.) § 1412; we

agree with the court that the town's vote to accept the roads could just as easily be construed as acceptance of fee simple title thereto. Whether the town was voting to accept fee simple title to the roads and road ends or to accept the dedication of an easement was a question of fact for the court. We conclude, in light of each deed's language, that the court reasonably found that the deeds conveyed and that the town accepted fee simple title.

## II

## ADVERSE POSSESSION

Alternatively, the Keatings claim that the court improperly concluded that they failed to prove title by adverse possession to a portion of the road end at Clearwater Road, and the Dimmocks claim that the court improperly concluded that they failed to prove title by adverse possession to a portion of the East Lane road end. The Dimmocks and the Keatings specifically challenge the court's finding that the town, since acquiring the road ends, continually has held for public use those portions that they claim to possess adversely without ever having intentionally abandoned them. The Keatings are aggrieved by the court's finding because it defeated their claim that they had acquired ownership, through adverse possession, of that portion of the road end at Clearwater Road from a hydrangea hedge to the east. The Dimmocks are aggrieved by the court's finding because it defeated their claim to have acquired ownership, through adverse possession, of that portion of the East Lane road end lying to the west and south of a hedge running along the eastern edge of their lot. Whether the town, since acquiring the road ends, continually has held for public use those portions that the Dimmocks and Keatings claim to possess adversely without ever having intentionally abandoned them is a

question of fact subject to the clearly erroneous standard of review.

"It is well established that [t]itle to realty held in fee by a state or any of its subdivisions for a public use cannot be acquired by adverse possession. . . . A public entity may claim immunity from adverse possession, however, only to the extent that the property against which a claim has been asserted is held for public use." (Citations omitted; internal quotation marks omitted.) *American Trading Real Estate Properties, Inc.* v. *Trumbull*, supra, 215 Conn. 77. "[L]and is . . . held for public use even when a municipality is not presently making use of the land but is simply holding it for development at some later time. Absent some evidence of municipal intention to abandon its plans for future development of the municipal property, the land is immune from claims of adverse possession." Id., 79–80. "Public use" includes a myriad of uses, many of which do not involve a physical intrusion on the land. For example, "a municipality might attempt to preserve the character of the community by acquiring open space land or greenbelts . . . ." (Internal quotation marks omitted.) Id., 80. "In light of the myriad of public uses that may be advanced through public ownership of undeveloped lands . . . property that is held in fee simple ownership by municipalities must be *presumed to be held for public use*. . . . [T]he party seeking title by adverse possession must bear the burden of rebutting that presumption. . . . Moreover, the rationale underlying the immunity of municipalities from adverse possession, that the public should not lose its rights to property as a result of the inattention of a governmental entity . . . applies with even greater force to situations involving undeveloped lands, which may, by their nature, garner even less attention from local governments suffering from the constraints of scarce fiscal

resources." (Citations omitted; emphasis added.) Id., 80–81.

Because we agree with the court that the 1932 deeds conveyed fee simple title to the town in the road ends, the propriety of the court's decision rejecting the Dimmocks' and Keatings' claims of adverse possession rests exclusively on the question of whether the town, after acquiring the road ends, has continually held them, including the disputed portions, for public use without ever having intentionally abandoned them. See id., 77, 79–80. That is a question of fact. See *Kelo* v. *New London*, 268 Conn. 1, 67, 843 A.2d 500 (2004), aff'd, 545 U.S. 469, 125 S. Ct. 2655, 162 L. Ed. 2d 439 (2005); *Cumberland Farms, Inc.* v. *Zoning Board of Appeals*, 74 Conn. App. 622, 631, 814 A.2d 396 (abandonment is question of fact and intent to abandon may be inferred as fact from circumstances), cert. denied, 263 Conn. 901, 819 A.2d 836 (2003); *Kroll* v. *Sebastian*, 58 Conn. App. 262, 266, 753 A.2d 384 (2000) (describing issue in *American Trading Real Estate Properties, Inc.*— whether land held for public use—as question of fact). "To the extent that the trial court has made findings of fact, our review is limited to deciding whether such findings were clearly erroneous. . . . A finding of fact is clearly erroneous when there is no evidence in the record to support it . . . . or when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed." (Internal quotation marks omitted.) *Mackie* v. *Hull*, supra, 69 Conn. App. 545.

The court found that the town, since acquiring the road ends, continually has held them and all disputed portions for public use without ever having intentionally abandoned them. Considering the legal principles previously set forth, we therefore examine whether this finding was clearly erroneous.

A

Held for Public Use—Intentional Abandonment
(Keatings)

In contesting the court's finding that the town has always held for public use and never intentionally abandoned the disputed portion of the road end at Clearwater Road, the Keatings rely heavily on a statement from *Goldman* v. *Quadrato*, 142 Conn. 398, 404, 114 A.2d 687 (1955): "The controlling factor is the use to which the realty was put after its acquisition." The Keatings interpret that statement to mean that, after acquiring land, a municipality must actually use it for a public purpose in order to be considered as holding the land for public use. They then argue that "the record is devoid of either any evidence of repair or any evidence that the town took *any* action with respect to the Clearwater Road end from the hydrangea hedge to the east." (Emphasis in original.) They further state that "[s]ince 1939, the town made no improvements to the area [and] *never* utilized the disputed portion of the Clearwater Road end for a public purpose . . . ." (Emphasis in original.) Applying their interpretation of the aforementioned statement from *Goldman* to their rendition of the relevant facts, the Keatings contend that the town, at all relevant times, did not hold for public use that portion of the road end at Clearwater Road from the hydrangea hedge to the east and, therefore, that the town is not immune from their claim of adverse possession of that portion.

The Keatings' interpretation of the aforementioned statement in *Goldman* is inapposite, at least with respect to the facts of this case. First, we note that actual use by a town is not a requirement in order for it to successfully claim immunity from adverse possession. A town holds land for public use even when it has not yet undertaken such use as long as it holds it

for development of a public use at some later time. *American Trading Real Estate Properties, Inc.* v. *Trumbull,* supra, 215 Conn. 78–80. Second, "[i]n *Goldman,* the property was a lot in a residential subdivision, and the city's acquisition of the property by foreclosure on a tax lien was intended only to protect the city's fisc from a delinquent taxpayer. That Waterbury had manifested no intention to develop the property, then or later, for any public purpose whatsoever, was clearly demonstrated by the fact that the city subsequently sold the property to a private party." Id., 81. In *Goldman,* because the land clearly was not dedicated to any public purpose or acquired for such a purpose, the presumption that the town held the land for public use could not stand; see id., 80; and the only way by which the town could have been considered as having held the land for public use was if it had actually done so. It was under that set of circumstances that the Supreme Court correctly stated: "The controlling factor is the use to which the realty was put after its acquisition." *Goldman* v. *Quadrato,* supra, 142 Conn. 404.

The circumstances in the present case are notably different from those in *Goldman* and render the aforementioned statement inapplicable here. The town in the present case acquired fee simple title to the road end at Clearwater Road not through a foreclosure on a tax lien or through some other similar means, but through a deed that expressly conveyed the land "for highway purposes . . . ." Not only is the town in this case therefore presumed to hold the land for public use because it acquired fee simple title to the land; see *American Trading Real Estate Properties, Inc.* v. *Trumbull,* supra, 215 Conn. 80; but it also should be seen as holding the land for public use because it acquired fee simple title to the land through a deed that expressly devoted the land to a public use, namely, "highway purposes . . . ."

The court held that the Keatings had failed to overcome their burden of rebutting the presumption that the town held the disputed portion of the road end at Clearwater Road for public use. We agree. All they purportedly have shown is that, since 1939, the town has made no improvements to the road end at Clearwater Road from the hydrangea hedge to the east. Even if we assume that to be true, it is insufficient to overcome the above mentioned presumption.

The Keatings also attempt to demonstrate that the town abandoned the disputed portion of the road end at Clearwater Road. Abandonment is accomplished "by nonuser by the public for a long period of time *with* the intention to abandon . . . ." (Emphasis added.) *Greist* v. *Amrhyn,* 80 Conn. 280, 285, 68 A. 521 (1907); accord *Mackie* v. *Hull,* supra, 69 Conn. App. 547. The court stated that "intent [to abandon] can be shown by express statements of town officials or formal acts of abandonment. It can also be inferred from the circumstances, such as the lack of any express plan for the future development of the property." The Keatings argue that the town expressed an intention to abandon the disputed portion of the road end at Clearwater Road by (1) not maintaining it, (2) purportedly acknowledging twice in 1993 that the hedge formed the boundary line of the road end, (3) not developing any site plans for the road end until 2002, well after the Keatings and their predecessors had controlled the land for the requisite adverse possession time, (4) placing a "scenic overlook" sign not on the disputed area but to the west of the disputed area and (5) not requiring the Keatings to relocate a well that they had placed on the disputed portion.

We find those arguments unpersuasive. The first assertion has already been addressed. With respect to the Keatings' second assertion, which is that the town acknowledged twice in 1993 that the hedge formed the

eastern boundary of the road end, the court made no such finding. In fact, it implicitly found otherwise. After recounting the board of selectmen's proposal in 1938 to abandon the road ends and the subsequent rejection thereof by the electors in favor of "repair[ing] and put[ting] in proper condition the road ends at Cornfield Point," the court stated that "[n]o evidence was presented that the town ever formally considered again abandoning its use of the road ends." We agree.

The Keatings contend that the town acknowledged twice in 1993 that the hedge formed the boundary line because Angus L. McDonald, a surveyor retained by the town, reported on January 4, 1993, that the relevant boundary of the road end on Clearwater Road was "evident left" and on October 6, 1993, that the boundary was "along hedge on left . . . ." A careful review of the exhibits reveals, however, that McDonald's reports were nothing more than preliminary reviews of the road ends at Cornfield Point. McDonald expressly states in the cover letter accompanying his October 6, 1993 review that it is "preliminary . . . ." Moreover, they are not reports *from* the town but are reports *to* the town. The October 6, 1993 report also states that the purpose of the review was to evaluate, in relevant part, evidence of boundaries. It does not state that its findings represent the definitive boundaries. The only boundary survey of the road end at Clearwater Road in the record that was prepared as a class A-2 boundary survey, pursuant to §§ 20-300b-1 through 20-300b-20 of the Regulations of Connecticut State Agencies, was a survey by Jeffrey A. Sanborn of Land Survey & Technical Services, Inc. That survey unmistakably shows the boundary not as being the hydrangea hedge but as being the boundary originally laid out in the November, 1922 map entitled "Cornfield Point Beach Club."

With respect to the Keatings' third assertion, that the town did not develop any site plans until 2002, we note

that the court stated that intent to abandon *"can . . .
be inferred from . . . the lack of any express plan for
the future development of the property"*; (emphasis
added); not that it *must* be inferred from the lack
thereof. The lack of an express plan for future develop-
ment can be construed as intent to abandon where, for
example, as in *Goldman* v. *Quadrato*, supra, 142 Conn.
403–404, the land clearly had not been dedicated to any
public purpose or acquired for such a purpose. Here,
the land was dedicated to a particular public purpose.

With respect to the Keatings' fourth and fifth asser-
tions, which are that the town expressed an intent to
abandon the disputed road end by placing a "scenic
overlook" sign to the west of it and not on it and by
not requiring the Keatings to relocate their well, we are
not persuaded. There is sufficient evidence to support
the court's finding, and the Keatings offer of evidence
does not leave us with the definite and firm conviction
that the court has made a mistake. See *Mackie* v. *Hull*,
supra, 69 Conn. App. 545. We therefore conclude that
the court's finding that the town held the road end at
Clearwater Road for public use, including that segment
from the hydrangea hedge to the east, without ever
having intentionally abandoned it is not clearly
erroneous.

B

Held for Public Use—Intentional Abandonment
(Dimmocks)

The Dimmocks acknowledge that a municipality may
be classified as holding land for public use when it is
not presently making use of the land but argue that in
order to be so classified, the municipality must at least
have some plan to develop the land for a future public
use. In support of their argument, the Dimmocks
emphasize the following language in *American Trading
Real Estate Properties, Inc.* v. *Trumbull*, supra, 215

Conn. 79–80: "[L]and is indeed held for public use even when a municipality is not presently making use of the land but is simply holding it for development at some later time. Absent some evidence of a municipal intention to abandon its plans for future development of the municipal property, the land is immune from claims of adverse possession." The Dimmocks also refer to *Goldman* v. *Quadrato*, supra, 142 Conn. 403, in which our Supreme Court held that the city of Waterbury did not hold a certain parcel of land for public use because, as paraphrased by the Dimmocks, there was no evidence of a plan to develop the land for a future public use.

The Dimmocks maintain that there is no evidence of any plan by the town in this case, except for its recent plans that prompted this litigation, to develop that portion of the East Lane road end lying to the west and south of a hedge running along the eastern edge of their lot, which they claim to possess adversely, for a future public use. They argue, therefore, that the town has not held that segment for public use and, consequently, is not immune from a claim of adverse possession. Claiming to have satisfied the elements of adverse possession well before the town's recent plans arose, they therefore contend that the court improperly ruled against their claim for adverse possession.

The Dimmocks assert that *American Trading Real Estate Properties, Inc.*, requires a town, which is not presently making use of land that it owns, to have a specific plan to develop that land for a future public use in order to be considered as holding the land for public use. We disagree.

The Dimmocks correctly note that our Supreme Court stated: "Absent some evidence of a municipal intention to abandon its *plans* for future development of the municipal property, the land is immune from

claims of adverse possession." (Emphasis added.) *American Trading Real Estate Properties, Inc.* v. *Trumbull,* supra, 215 Conn. 79–80. We do not believe, however, that by using the word "plans," our Supreme Court was requiring a municipality to have a specific plan. Later, in holding that the town of Trumbull was immune from the plaintiff's claim of adverse possession, the court made no reference to the absence of any plan as a basis for its holding. It stated: "[T]he plaintiff has presented no evidence indicating that the defendant holds the property for some nonpublic use or has abandoned its *intention to hold the roadway for public purposes . . . .*" (Emphasis added.) Id., 81–82. Previously in its opinion, the court also suggested that "an *intention* to develop [the land] at some time in the future," not a specific plan to develop it in the future, would be sufficient to satisfy the "[held for] public use requirement." (Emphasis added.) Id., 79. Furthermore, without mentioning anything about a specific plan to develop the land for a future public use, our Supreme Court held that "property that is held in fee simple ownership by municipalities *must be presumed to be held for public use.*" (Emphasis added.) Id., 80. In the context of these statements, we do not believe that the court was requiring the town to have a specific plan.

Moreover, in *Goldman* v. *Quadrato,* supra, 142 Conn. 398, our Supreme Court did not, as the Dimmocks assert, conclude that the city did not hold the land for public use because there was no evidence of a plan to develop it for a future public use. As mentioned previously, the court concluded that the city did not hold the land for public use because, in addition to not having been actually used for any public purpose, the land "passed to the city . . . by virtue of a judgment foreclosing a tax lien" and, therefore, was not "dedicated to any public purpose." Id., 403. "In *Goldman* . . . the city's acquisition of the property by foreclosure

on a tax lien was intended only to protect the city's fisc from a delinquent tax payer." *American Trading Real Estate Properties, Inc.* v. *Trumbull,* supra, 215 Conn. 81.

By contrast, the town in the present case acquired fee simple title to the East Lane road end not through a foreclosure on a tax lien but through a deed that expressly dedicated the land "for highway purposes . . . ." Not only is the town therefore presumed to hold the land for public use because it acquired fee simple title to the land; see id., 80; but it should also be seen as holding the land for public use because it acquired the land through a deed that expressly devoted the land to a public use.

As with the Keatings' claim to Clearwater Road, the court held that the Dimmocks failed to overcome their burden of rebutting the presumption that the town held the disputed portion of the East Lane road end. We agree.

The Dimmocks purportedly have shown that throughout the period of their alleged adverse possession, the town did not have a plan to develop for a public use the disputed portion of the East Lane road end. Even if we assume it to be true that the town had no specific plan until recently, it is, under the facts of this case, irrelevant and, therefore, insufficient to overcome the previously mentioned presumption. We therefore conclude that the court's finding that the town held the East Lane road end for public use, including that portion the Dimmocks claim to possess adversely, without ever having intentionally abandoned it, is not clearly erroneous.

In light of our analysis, we conclude that the court's finding that the town held the road ends for public use, including the disputed portions, and did not intend to abandon nor ever did abandon them, is not clearly erro-

neous. Accordingly, we affirm the judgment of the trial court holding that the town is immune from the Dimmocks' and Keatings' claims of adverse possession.

## III

## IMPROVEMENTS TO ROAD ENDS

Finally, the association challenges the court's determination that the town could implement all of its proposed improvements to the road ends except for the installation of certain bollards.[17] The association essentially claims (1) that the court's decision improperly allows the town to use the road ends in a manner inconsistent with the purpose for which they were conveyed, (2) that the court improperly concluded that the town's proposed parking spaces on the road ends do not interfere with the association's right of access and (3) that the court improperly held that the association's ban on public parking in the streets at Cornfield Point, as authorized by Spec. Acts No. 467, § 12, does not apply to the road ends and does not prevent the town from installing parking spaces on them.

### A

In support of the association's claim that the court's decision improperly allows the town to use the road ends in a manner inconsistent with the purpose for which they were conveyed, it argues that a road that is deeded to a town for highway purposes may not be used for any other inconsistent purpose and that the proposed improvements in this case are inconsistent with the purposes for which the roads were conveyed, namely, for highway purposes. We agree with the asso-

---

[17] The association, the Keatings and the Dimmocks all state on their original appeal forms that they are appealing from the March 15, 2004 memorandum of decision, but only the association briefs the issue of whether the court properly concluded that the town could install parking spaces at the road ends.

ciation that the road ends, which the town holds in fee simple, are to be used for highway purposes.[18]

As stated previously, once a town acquires fee simple title to a street or road for highway purposes, it is generally said to be held in trust for the benefit of all the public *for such purposes*. See *Winchester* v. *Cox*, supra, 129 Conn. 111–12; 39 Am. Jur. 2d 714–15, Highways, Streets, and Bridges § 184 (1999). The road ends here, which are part of the roads to which they are connected; see part I; are therefore held, like the entire road, in trust for the benefit of all the public for highway purposes. "When the fee of [a road] has been transferred to [a town], the [town] may use the [road] for any public purpose not inconsistent with or prejudicial to its use for highway purposes." *Perlmutter* v. *Greene*, 259 N.Y. 327, 329–30, 182 N.E. 5 (1932); see *Derby* v. *Alling*, supra, 40 Conn. 433, 435 (holding that grantors renounced all claim to street and that town held, in trust for public, title to street for purpose contemplated by deed); *Taylor* v. *Public Hall Co.*, supra, 35 Conn. 431 (holding, where land conveyed by warrantee deed to town "for the sole use and purpose of a public highway," deed conveyed more than easement, and as long as premises continued to be used for highway, town had complete title to fee of land).

The question is, therefore, whether the proposed improvements are not inconsistent with or prejudicial to the town's obligation to use the road ends for highway purposes.[19] That is a question of fact for the trial court, which is subject to the clearly erroneous standard of review. The court, however, did not expressly find that

[18] See footnote 13.

[19] It is unnecessary for us to consider whether the town's proposed installation of certain bollards comports with the language, "for highway purposes," in the deeds. The town did not appeal from the court's judgment granting the association's request for an order that the town refrain from installing those bollards.

the proposed changes were not inconsistent with or prejudicial to the town's obligation to use the road ends for highway purposes. Nevertheless, case law, certain statutes, subordinate facts found by the court and evidence in the record make inevitable the conclusion that the town's proposed improvements are not inconsistent with or prejudicial to the town's obligation to use the road ends for highway purposes. *State* v. *Shashaty*, 251 Conn. 768, 783, 742 A.2d 786 (1999) (allowing conclusions of fact to be drawn on appeal when subordinate facts found by trial court make conclusion inevitable or where uncontroverted evidence and testimony in record make factual conclusion so obvious as to be inherent in trial court's decision), cert. denied, 529 U.S. 1094, 120 S. Ct. 1734, 146 L. Ed. 2d 653 (2000).

"It has long been established that the essential feature of a highway is that it is a road or way open to the use of the public." *Robinson* v. *Faulkner*, 163 Conn. 365, 369, 306 A.2d 857 (1972). "Highways have existed from the earliest times and are constructed primarily for the passage of persons, on foot or in vehicles, and for the carriage of goods." 39 Am. Jur. 2d 583, supra, § 1. "A highway may be a cul-de-sac, or even a mere approach to a court occupied by a group of houses. It is not essential to a highway that it be a thoroughfare, but rather it may terminate without connecting with another road at one end . . . ." Id., p. 584. Where a deed conveys to a town a road for highway purposes, the town is not necessarily under an obligation to pave the road; see id., § 189, p. 719; or to use the road solely for vehicular access. See *Cohen* v. *Hartford*, supra, 244 Conn. 214 (deed's requirement that street was to be used "for the purpose of a road and for no other purpose" did not preclude city from restricting use of street to pedestrian travel and noting that "road" does not connote thoroughfare that necessarily remains open to vehicular traffic at all times); see also General Statutes

§§ 14-286a and 14-288 (treating bicycling as activity within purview of activities performed on highways). Furthermore, pursuant to General Statutes § 7-148 (c) (6) (C) (i) and (ii), respectively, a town has the power to "[l]ay out, construct, reconstruct, alter, maintain, repair, control [and] operate . . . streets [and] highways," and the power to "[k]eep open and safe for public use and travel and free from encroachment or obstruction the streets . . . in the municipality . . . ."

With that in mind, we conclude that none of the town's proposed improvements,[20] excluding the aforementioned bollards,[21] is inconsistent with or prejudicial to the town's obligation to use the road ends for highway purposes.

### B

Whether installation of the proposed parking spaces would interfere with the association and its members' right of access[22] is a question of fact to which we apply the clearly erroneous standard of review. After reviewing the entire record, we conclude that there is ample evidence in the record to support the court's finding. Moreover, we find compelling the court's reasoning with respect to that claim.[23] The court's finding

---

[20] The town proposes to remove various hedges, fences and other alleged encroachments and to install permanent markers identifying the boundaries of the road ends, bicycle racks, identification signs and four parking spaces, one at each of the road ends at Mohican Road, Belleaire Drive, Saltaire Drive and Cottage Road.

[21] See footnote 19.

[22] See footnote 10.

[23] The court reasoned: "Although the designated parking space appears to extend the width of the road end, the existence of a designated parking area does not block access. It is a vehicle parking in the space, not the space itself, which could impede access and any vehicle parking in the space will be there only temporarily and for a short duration. Given the plaintiff's intermittent need for vehicular access to the beach, it is not unreasonable to expect the association to gain access to the beach during a time when no vehicle is obstructing access. Moreover, the association can simply ask the driver of an obstructing vehicle to move the vehicle so access can be achieved. Further, a single vehicle parked in the parking space would

that "[t]he existence of the proposed public parking space[s] will not unreasonably interfere with the . . . association's right of vehicular access to the beach" is not clearly erroneous.

## C

Finally, the association claims that the court improperly held that the association's ban on public parking in the streets at Cornfield Point, as authorized by Spec. Acts No. 467, § 12, does not apply to the road ends and does not prevent the town from installing parking spaces on them. Whether the association's ban applies to the road ends and prevents the installation of parking spaces is a question of law to which we apply plenary review.

The court acknowledged that "[t]he General Assembly in 1943 through a special act . . . gave the board of governors of the association the authority to 'enact by-laws or ordinances . . . to regulate the parking of motor vehicles . . . .' [Spec. Acts No. 467, § 12]." The court also acknowledged that "evidence presented before [it] indicated that the board of governors of the association has enacted by-laws prohibiting parking on the streets of Cornfield Point." What the association contests, however, is the court's conclusion that because the proposed "parking spaces [will be] on the road ends themselves, which is land owned by the town, those parking spaces do not constitute parking on the streets of Cornfield Point." Implicit in the court's reasoning is that the road ends are not roads or streets within Cornfield Point and, therefore, are not subject to the association's parking ban.

not obstruct vehicular access to the beach. The road end is forty feet wide, considerably wider than the length of a single automobile. Finally, public parking spaces are not proposed for all of the road ends. Only four of the nine road ends at issue in this case are designated for public parking. The Cornfield Point Association is free to use the other five road ends for vehicular access to the reserved beach."

In light of our prior determination that the road ends *are* part of the roads to which they are attached, we find the court's reasoning to be less than compelling. As part of the streets and roads to which they are attached, the road ends are subject to any existing bylaws or ordinances of the association that prohibit parking on the streets of Cornfield Point. This does not mean, however, that the town is absolutely precluded from installing its proposed parking spaces on the road ends. As noted previously and as the court explained in its decision, Spec. Acts No. 467, § 18, provides that "[i]f any by-laws or regulation[s] adopted by [t]he . . . [a]ssociation shall conflict with any lawful ordinance of the town . . . the ordinance of said town shall prevail and supersede the by-law . . . of said association." The town, therefore, is free to enact an ordinance that supersedes the association's ban on public parking and authorizes the town to install the proposed parking spaces.

Because, however, there is no evidence before us that the town has yet enacted any such superseding ordinance, we hold, to the extent there is no such ordinance, that the court improperly concluded that the association's existing parking ban does not apply to the road ends and does not prevent the town from installing parking spaces on them.

On the plaintiff's appeal, the judgment is reversed only as to the determination that the plaintiff's existing parking ban is inapplicable and does not prevent the town from installing the proposed parking spaces in question and the case is remanded for further proceedings in accordance with law. The judgment is affirmed in all other respects.

In this opinion the other judges concurred.